UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATIONAL JEWISH DEMOCRATIC COUNCIL and MARC R. STANLEY,

Plaintiffs,

-against-

SHELDON G. ADELSON,

Defendant.

Case No.

**COMPLAINT**

Plaintiffs Demand Trial by Jury

---

Plaintiffs National Jewish Democratic Council ("NJDC") and Marc R. Stanley allege:

## REMEDYING A WRONG

1. Bullies should be punished. It is now beyond cavil that Sheldon Adelson deliberately abused the courts to try—in his words—to "bankrupt" the National Jewish Democratic Council for having the temerity to criticize him. After five years of grueling litigation, two federal courts and the Supreme Court of Nevada all found that Adelson's lawsuit against the NJDC was wrong. It was, in the legal terms of Nevada's statutes, a strategic litigation against public policy or a "SLAPP" suit. Adelson's case was dismissed.

2. But dismissing Adelson's act of legal sadism is not enough. NJDC and Marc Stanley still bear wounds from Adelson's SLAPP suit that have not healed. The organization is in tatters, barely functioning. Its Chair is reeling from the public relations fallout from Adelson's onslaught.

3. Nevada's anti-SLAPP statute was enacted with a specific remedy for this exact circumstance. The statute provides that those who prevail on a motion to dismiss a SLAPP suit may bring a new case of their own to recover the damages they suffered from that suit.

## THE PARTIES

4. Plaintiff National Jewish Democratic Council (NJDC) is a District of Columbia 501(c)(4) non-profit corporation.

5. Plaintiff Marc R. Stanley is a resident of the State of Texas and the Chair of NJDC.

6. Defendant Sheldon G. Adelson is a resident of the State of Nevada.

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000.00 exclusive of recoverable interest and costs, and minimal diversity exists.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims of Plaintiffs occurred in this District.

## FACTUAL ALLEGATIONS

9. This case arises from a narcissistic act of retribution: Sheldon Adelson's vain attempt to silence yet another one of his critics.

10. Adelson is a man of enormous wealth, power, and influence. He owns casino properties in Nevada, Pennsylvania, Singapore, and Macau. He owns two newspapers: the Israel Hayom and the Las Vegas Review-Journal. He was reported by Forbes, as of 2018, to be the world's 16th-richest man, worth more than $43 billion dollars.

11. Despite his thick wallet, Adelson has a thin skin.

**Adelson's Pattern of Vexatious Litigation**

12. Adelson regularly uses his virtually unlimited financial resources to finance defamation actions to extort apologies and retractions. He uses litigation—and the threat of

litigation—in this country and others, as a weapon to punish and intimidate his critics.

13. For example, Adelson instituted a defamation lawsuit against a former employee, Moshe Hananel, in Las Vegas in 2006, for allegedly stating that he had taken advantage of a blind man. Adelson disputed that the man was blind. After three years of burdensome and costly litigation, a jury rendered a verdict for Hananel, which was affirmed on appeal. *See Adelson v. Hananel*, 428 F. App'x 717 (9th Cir. 2011)).

14. In California, Adelson instituted defamation litigation to punish and intimidate Las Vegas Review-Journal columnist John L. Smith, who had written a book about him entitled *Sharks in the Desert*. After two years of litigation, both Smith and his publisher were forced to file for bankruptcy. Unsatisfied, Adelson pursued the libel case as an adversary proceeding in bankruptcy court. *In re Smith*, 389 B.R. 902 (Bankr. Nev. 2008). Ultimately, already in bankruptcy and under the ongoing burden of onerous defense costs, the publisher settled and was obliged to agree, as part of Adelson's price for allowing it to emerge from bankruptcy, to publish an apology and retraction. Smith, however, refused to settle or apologize, reportedly even rejecting Adelson's offer to make a secret donation to a medical fund for Smith's ill daughter if Smith would do so. To vindicate the accuracy of his reporting, Smith opposed Adelson's efforts to dismiss the case against him voluntarily.

15. In the end, Smith was declared the prevailing party by the Bankruptcy Court and Adelson was ordered to pay his costs. One of Smith's editors later said: "This whole series of events is nothing more or less than trying to coerce everyone in journalism not to write anything [Adelson] doesn't like." Connie Bruck, *The Brass Ring*, The New Yorker, June 30, 2008, available online at http://www.newyorker.com/reporting/2008/06/30/080630fa_fact_ bruck#ixzz26TIgS57x.

16. Adelson sued London's *Daily Mail*, extracting in settlement a lengthy and abject apology. Thereafter, he sought to invoke the jurisdiction of the London courts in a defamation action against an American labor union and an official of that union. *See Adelson v. Anderson*, [2011] EWHC (QB) 2497, 2011 WL 4529292 (Eng.) In 2011, Adelson not only lost that case but was obliged to pay the Union £175,000 in costs.

17. Also in 2011, according to published reports, journalists filed a formal protest with the Israeli Press Council when an Israeli TV station was apparently pressured by Adelson into apologizing for airing an uncomplimentary report about his business dealings.

18. Adelson also sued Steven Jacobs, the former head of his Macau casinos, for defamation in Florida, alleging that the privileged statements in his declaration submitted in another Nevada action were actionable.

19. In one notorious instance, in which Adelson and his own children became embroiled in a multi-year litigation against each other in Massachusetts, the court described Adelson's litigation strategy as follows:

> Defendant Adelson has requested taxing Plaintiffs for costs associated with assorted depositions conducted during the bitterly-fought pre-trial phase of this rancid and unseemly dispute.
>
> This case contains several parties whose means and disposition perfectly illustrate the remark attributed to H.L. Mencken that the best client is a frightened millionaire. They cried "Havoc," i.e., no quarter, and did indeed let loose the dogs of war. Cases like this give Discovery a bad name.
>
> Thus the award Defendant Adelson here seeks is, in the context of this litigation, quite inappropriate. Although he prevailed, his hands, in the metaphoric, if not Equity, sense, were far from pristine, as the Discovery Master has made abundantly clear. Any attempt to unearth the merits would certainly engender another outbreak of forensic saturation bombing, demanding additional court resources while not ensuring even a rough approach to justice.

4

> As a matter of discretion, I decline to award deposition costs.
>
> *Adelson v. Adelson*, 2001 WL 736739, at *1 (Mass. Super. 2001), *aff'd*, 806 N.E.2d 108 (Mass. App. 2004).

20. As Nevada Congresswoman Shelley Berkley who, like many of Adelson's other perceived adversaries was once his employee, explained in a column she published in a Nevada newspaper: "Over time, I observed Mr. Adelson plot vendettas against anyone whom he believed stood in his way. However miniscule the perceived affront, he was certain to go ballistic, using his money and position to bully any 'opponent' – great or small – into submission." Shelley Berkley, *A Political Machine: Sands boss trying to buy House seat*, Las Vegas Review-Journal, Sept. 27, 1998.

**Adelson's Campaign Contribution Scandal**

21. Adelson is a member of the Republican Party and was reportedly the largest donor of any, in both the 2012 and 2016 presidential campaigns. During the 2012 campaign, Adelson's donations triggered scrutiny.

22. In the midst of the campaign, on June 14, 2012, Senator John McCain asserted in an interview on PBS' News Hour that the unlimited flow of money to candidates of all parties would cause "scandals." The one donor he identified by name was Adelson, as he lamented the flow of "foreign money" from Adelson's casinos in Macau, a Chinese administrative district, into the U.S. campaign. Senator McCain's charge – aimed directly at Adelson, a donor to his own party, suggesting his money was tainted – was the subject of multiple news reports in the days and weeks that followed.

23. The "foreign money" Senator McCain alleged that Adelson has injected in political campaigns reportedly emanated from his casino operations in two Macau hotels.

Adelson's operations in Macau became the subject of at least two federal criminal investigations and one significant civil action in the United States. Adelson's company has publicly conceded that the criminal investigations were instituted because of the civil lawsuit filed against it in Nevada by the former head of his operations in Macau, Steven Jacobs.

24. In December 2010, news media around the world reported that Chinese authorities had conducted a sweep of the Venetian Macau, Adelson's flagship hotel there, rounding up more than 100 prostitutes and 22 pimps operating unlawfully in the hotel's casino.

25. In his lawsuit, Jacobs claimed that he was fired from his position overseeing all of Adelson's operations in Macau for resisting Adelson's demands that he engage in the unlawful conduct that forms the basis of the ongoing federal investigations and was the subject of the 2010 prostitution sting by Chinese officials.

**NJDC Posts a Petition Challenging Romney to Divest from Adelson's Investments**

26. The NJDC is a 501(c)(4) non-profit organization, created in 1990 to maximize Jewish support for Democrats at the federal and state levels of government and to educate Democratic elected officials and candidates to increase support for Jewish domestic and foreign policy priorities.

27. On July 5, 2012, in the wake of the multiple press reports recounting the federal criminal investigations concerning Adelson's Macau operations, Senator McCain's comments about the use of the proceeds from those operations to fund political campaigns in the United States, and the filing of a declaration in the Jacobs case in Nevada, the NJDC posted a Petition on its website.

28. The Petition read as follows:

6

> **Tell Romney to Reject Adelson's Dirty Money**
>
> As you saw during the Republican primaries, GOP mega-donor Sheldon Adelson dumped millions of dollars into supporting Newt Gingrich's feckless campaign. **Now he's doing the same for Mitt Romney – with no plans to stop.** But perhaps the most alarming aspect of Adelson's potentially unlimited contributions is where the money comes from.
>
> It's well known that Adelson makes tremendous sums of money through his casinos in China which – according to 2008 Republican presidential candidate <u>Senator John McCain (AZ)</u> -- means that Chinese **"foreign money" (to quote McCain) is flooding our political system.** But this week, reports surfaced that in addition to his <u>anti-union</u> and allegedly <u>corrupt business practices</u>, **Adelson "<u>personally approved</u>" of prostitution in his Macau casinos.**
>
> Given these reports, **Romney and the rest of the Republican Party must cease accepting Adelson's tainted money immediately**. Sign NJDC's petition below, and click here to share the image above on Facebook to help spread the word.
>
> Already signed? <u>Click here to enlist your family and friends</u> in the effort to stop the influence of Adelson's tainted money and protect our democracy.

29. The hyperlinks in the Petition (illustrated as underlines in the text above) brought readers to news reports containing more detailed information about each statement. The Petition's reference to "reports" that had "surfaced" that "Adelson 'personally approved' of prostitution in his Macau casinos," hyperlinked to an article disseminated by the AP on June 28, 2012 and republished in newspapers and on websites throughout the world.

**NJDC Withdraws the Petition, Then Receives Threats from Adelson**

30. Less than a week after it was first posted, on July 11, NJDC took the Petition down from its website after receiving telephone calls (and threats) from Adelson's attorney and Rabbi Shmuley Boteach (who were both attacking NJDC in the press), criticism from the Jewish

7

Federations of North America (of which Sheldon is a major donor), and pressure from a variety of others as well.

31. In conjunction with taking down the petition, NJDC issued the following statement:

> Regarding our recent campaign surrounding Sheldon Adelson, we don't believe we engaged in character assassination; we stand by everything we said, which was sourced from current, credible news accounts. Accusations against Mr. Adelson were made not by us, but by others, including Senator John McCain (R- AZ). Nonetheless, we regret the concern that this campaign has caused. And in the interest of *shalom bayit* (peace in our home / community), we are going to take down our petition today. Moving forward, we'll continue to work hard to fight against the unique threat posed by the outsized influence of certain individual megadonors, which rightly concerns most Americans and most American Jews.

32. On July 17, Adelson's counsel sent a letter to NJDC demanding that they (1) remove the Petition, (2) agree not to republish it and (3) prominently retract and apologize for it, even though NJDC had removed the Petition one week earlier.

33. Three days later, on July 20, Adelson sued Jacobs in Florida state court for defamation based on the statements in the Jacobs' declaration regarding Adelson's approval of prostitution in his Macau hotels, contending that they "were made as part of Defendant's continuing effort to smear Mr. Adelson and his companies through the filing of false declarations intended for republication by the media."

**Adelson Files a Punitive Suit to "Bankrupt" NJDC**

34. On August 8, Adelson filed a complaint alleging libel against NJDC, its Chair, Marc Stanley, and its Executive Director, David Harris, in the Southern District of New York (the "Complaint"). A true and correct copy of the Adelson Complaint is attached as Exhibit A.

8

35. The Complaint selectively parsed the Petition and purported to base its claims solely on the ground that the Petition contained an allegation that Adelson approved prostitution in his Macau properties and that such an allegation (and only that allegation) is false, "inherently improbable on [its] face," and based "solely" on "a source that was unreliable and known to be biased against Adelson."

36. It does not appear that Adelson filed any other lawsuits against the numerous publications that had previously reported on the allegations concerning prostitution in the Macau casinos.

37. The filing of the NJDC lawsuit, as well as the events that preceded it, were the subject of extensive press coverage and commentary. Invariably, these reports included statements by Adelson and his supporters denying the truth of the statements made about prostitution, impugning Jacobs' credibility, and chastising and even vilifying NJDC for referencing the issue in the Petition.

38. Congressional candidate Rabbi Schmuley Boteach, a recent recipient of $500,000 in campaign contributions from Adelson and his wife, compared Harris to Republican "hatemongers" for his "below-the-belt attack" on Adelson.

39. Adelson told others in private that his goal in suing the organization was to "put NJDC out of business" and "bankrupt these people."

**Two Federal Courts and the Supreme Court of Nevada Dismiss Adelson's Suit as a Strategic Litigation Against Public Policy**

40. NJDC, Stanley, and Harris moved to dismiss Adelson's Complaint on April 23, 2013. Their motion also sought attorneys' fees and costs.

41. Five months later, on September 30, 2013, the United States District Court for the Southern District of New York (Oetken, J.) issued a 57-page Opinion and Order granting the

motion and dismissing the Adelson Complaint under the Nevada Anti-SLAPP Act, Nev. Rev. Stat. § 41.635 et seq. A true and correct copy of the Opinion and Order is attached as Exhibit B.

42. In its opinion, the District Court noted that the Nevada statute provides that "[i]f the motion [to dismiss] is granted, the person against whom the action is brought may 'bring a separate action to recover: (a) Compensatory damages; (b) Punitive damages; and (c) Attorney's fees and costs of bringing the separate action." The Court concluded that Adelson's Complaint should be dismissed, among other reasons, because "Defendants' communications were made without knowledge of falsehood because Plaintiff failed to plead that Defendants acted with knowledge of falsehood." Undeterred, Adelson appealed.

43. On appeal, the Second Circuit, on December 19, 2014, certified two questions to the Nevada Supreme Court that it stated may be determinative of the appeal. A true and correct copy of the order of the Court of Appeals is attached as Exhibit C.

44. The Nevada Supreme Court issued its opinion answering the questions on September 27, 2017. A true and correct copy of the opinion of the Nevada Supreme Court is attached as Exhibit D. With regard to the second certified question, the court referred the Second Circuit to one of its recent decisions that held the application of Nevada's anti-SLAPP statute, "prior to the 2013 amendment, is not limited to communication addressed to a government agency, but includes speech 'aimed at procuring any governmental or electoral action.'"

45. Two months after the Nevada Supreme Court decision, on November 29, 2017, the Second Circuit affirmed the dismissal of the Adelson Complaint. The Court of Appeals issued its Mandate on December 20, 2017. A true and correct copy of the mandate and opinion affirming dismissal is attached as Exhibit E.

**The Southern District of New York Enters Judgment Against Adelson**

46. After exhausting his appeals, Adelson had nowhere further to go. Instead, he vigorously contested the ensuing motions for attorneys' fees and costs. On March 29, 2018, the District Court awarded $1,909,476.50 in attorney's fees and $55,716.64 in costs to NJDC, Stanley, and Harris. A true and correct copy of the Opinion and Order is attached as Exhibit F.

47. This decision was memorialized in a judgment dated March 30, 2018. A true and correct copy of the judgment is attached as Exhibit G. Adelson did not appeal this judgment, which is now final and unappealable.

**Adelson's Litigation Achieves its End: The Demise of NJDC**

48. The lengthy pendency of Adelson's lawsuit took its toll on NJDC, a political operation which became unable to raise revenue and continue conducting its affairs.

49. The entity is currently saddled with nearly $800,000 of debt and unable to raise funds to support its mission. Ten years ago, in 2008, the NJDC raised $2 million. In the years that followed before the lawsuit, that number fluctuated between $670,000 and $1.7 million. Adelson's lawsuit put a stake in the heart of the entity's fundraising. The year after the suit, in 2013, revenues dropped to $417,000. In 2014, the organization raised $462,000 and took a loan of $200,000 from one of its board members to cover costs. The last year NJDC raised any real revenue was 2015, when the entity raised $132,000. Today, the NJDC exists solely to recover its debt from litigation and pay its bills.

50. In addition to the destruction of NJDC's fundraising, Adelson's suit scared away potential board members who were unwilling to become associated with NJDC during the lawsuit and it caused NJDC's executive director to quit the organization and find a career away from politics.

51. Stanley also suffered damage to his reputation, as well as significant embarrassment and anguish from being targeted with a lawsuit demanding $60 million in damages—an amount that raised the specter of bankruptcy. Stanley's law practice and career goals have also suffered from reputational harm.

52. Finally, both NJDC and Stanley have suffered the profound harm of having their First Amendment rights trampled. Both retreated into silence following Adelson's legal assault and were deprived of the right to assert their voice in the 2012 election.

## CLAIM
(Action for Compensatory Damages, Punitive Damages,
and Attorneys' Fees and Costs, Nev. Rev. Stat. § 41.670)

53. Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as if fully set forth herein.

54. Nevada provides a remedy for the harm from SLAPP suits, like Adelson filed here. A movant who succeeds on a special motion to dismiss under the Nevada anti-SLAPP statute is entitled to "bring a separate action to recover ... (1) Compensatory damages; (2) Punitive damages; and (3) Attorneys' fees and costs of bringing the separate action." Nev. Rev. Stat. § 41.670(c).

55. NJDC and Stanley prevailed on a special motion to dismiss filed pursuant to the Nevada anti-SLAPP statute, Nev. Rev. Stat. § 41.660.

56. Adelson's conduct as described in this Complaint and its Exhibits, damaged NJDC and Stanley in excess of $75,000.

57. NJDC and Stanley are entitled to recover compensatory damages in an amount to be proved at trial, punitive damages in an amount to be established at trial, and attorneys' fees and costs. Nev. Rev. Stat. § 41.670(c).

WHEREFORE, Plaintiffs respectfully request that the Court grant them the following relief:

    A.    Damages in an amount to be determined at trial;

    B.    Costs, fees, and attorneys' fees of this proceeding;

    C.    Punitive damages; and

    D.    Any such other and further relief as this Court deems just, proper, and equitable.

Dated:  New York, New York  
         September 25, 2018

EMERY CELLI BRINCKERHOFF  
& ABADY LLP

By: _/s/ Richard D. Emery_  
Richard D. Emery  
O. Andrew F. Wilson  
600 Fifth Avenue, 10th Floor  
New York, NY 10020  
(212) 763-50000

*Attorneys for Plaintiffs*

13