JCCTNATC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  NATIONAL JEWISH DEMOCRATIC
   COUNCIL, et al.,
4
                Plaintiffs,
5
          v.                              18 CV 8787 (JPO)
6
   SHELDON D. ADELSON,
7
                Defendant.
8
   ------------------------------x
9                                         New York, N.Y.
                                          December 12, 2019
10                                        11:10 a.m.

11 Before:

12                     HON. J. PAUL OETKEN,

13                                        District Judge

14                        APPEARANCES

15 EMERY CELLI BRINKERHOFF & ABADY
        Attorneys for Plaintiffs
16 BY:  RICHARD EMERY
        ANDREW WILSON
17      ANDREW JONDAHL

18 JONES DAY
        Attorneys for Defendant
19 BY:  LEE ARMSTRONG
        JAMES GROSS
20

21

22

23

24

25

JCCTNATC

```
 1              (Case called)

 2              THE COURT:  Good morning.  Welcome everyone.  Sorry

 3      for the delay.  More than half of the elevators in this

 4      building currently don't work because the renovation,

 5      apparently seven years closing the building wasn't enough to

 6      fix the elevators.  So everyone is running a little late, but

 7      they will be fixed sometime in 2020.

 8              I brought the parties in.  I know there's a couple of

 9      other things pending, including a motion for reconsideration,

10      and there's an interlocutory appeal that Mr. Adelson is

11      pursuing in the Second Circuit, but in the interim I received

12      the parties' letters at Docket Numbers 57, 58 and 59 regarding

13      a few other issues, so I wanted to bring you in to talk about

14      those.

15              Before we get into that, could I just get an update on

16      the status of discovery, where things stand at this point?  I

17      understand there's been a deposition of Mr. Adelson, right, and

18      no either other depositions?

19              MR. ARMSTRONG:  Your Honor, there has been only one

20      deposition, and the only deposition that the plaintiffs have

21      asked for so far, that's Mr. Adelson.  We have noticed, I

22      believe it's six people.  We haven't taken any depositions

23      because that relates to the one of the issues that we raised

24      before your Honor.  We are awaiting their review of various

25      documents that they say they will not review unless we pay for
```

JCCTNATC

1    them.

2         I don't know if you want me to go further with the

3    discussion, but that's -- I will tell you that it has, at least

4    from our side, been sort of a one-way street.  We negotiated

5    search terms back in the summer, and we went back and forth, we

6    had several meet and confers, we tweaked the terms, pretty

7    elaborate terms and conjunctions and additives, and we ended up

8    with a universe of documents that we agreed in the stipulation

9    we would review.  We went ahead and did that.  We then produced

10   responsive documents, we provided a privilege log and provided

11   Mr. Adelson for his deposition.

12        We were waiting for them to do their part, and then

13   three weeks ago we hear for the first time that they are not

14   going to produce -- they're not going to review any of these

15   documents because they believe we should pay for their review,

16   and then they he added on the other issues that are before you:

17   We should pay for their attorneys' fees, we should pay on an

18   interim basis and accept service on Mrs. Adelson of the

19   subpoena that they have served.  And they want to add --

20             THE COURT:  Dr. Adelson.

21             MR. ARMSTRONG:  -- Dr. Adelson, that's correct.

22             THE COURT:  I gathered all that from the letters.

23        First of all, let me say an as overview I'm quite

24   disappointed in all of you, because the last time I saw you

25   there was talk of once these very interesting legal issues got

JCCTNATC

 1    resolved that you would work out the amount of compensatory

 2    damages and this would be resolved, and you obviously have

 3    completely different ideas about what is lawsuit is about.  I

 4    have decided the interesting legal issues, at least some of

 5    them, and it seems like you're nowhere near a resolution.  I

 6    don't know whose head is in the clouds, but I was hopeful that

 7    this would be something that's resolved.

 8             Let me give you all a chance to respond.

 9             MR. WILSON:  Good morning your Honor, Andrew Wilson

10    for the plaintiffs.

11             The case has been progressing in some ways the way in

12    which my colleague has summarized it, but we are continuing --

13    the major issue in discovery happened in around September of

14    this year when we got an additional series of custodians from

15    an entity that's called Blue Light.  This is a political

16    consulting group that basically took on the role of keeping

17    NJDC on life support and sort of a hibernation mode after the

18    Adelson lawsuit and its repercussions.  And the document trove

19    that we got from Blue Light was so substantial that we came

20    back to the defendants and wanted to renegotiate some of the

21    terms because we had tripled the number of documents we were

22    going to have to look at.  And that was actually a productive

23    exchange.  We ended up coming to an agreement with the

24    defendants about narrowing some of the surplusage in the terms

25    in around the middle of November.

JCCTNATC

1          Then notwithstanding the narrowing of the terms, we

2     still have around 55,000 documents to review, and that required

3     us, in order to meet the timeframe that we wanted to, to retain

4     an outside vendor to do a threshold relevance review.  And

5     that's when we began the meet and confer process with

6     Mr. Adelson's attorneys to see if we could agree on some form

7     of cost shifting, because it's substantial out-of-pocket cost

8     for us.

9          Those are issues on -- the merits we can talk about

10    later on, but to give your Honor the update, we have gone

11    forward.  We have retained that vendor.  We have already begun

12    the review.  We have gone out of pocket to enter into that

13    contract.  The review is underway.  We received this week the

14    first four batches of documents.  Those are under review by our

15    firm.  We expect to make the next rolling production within the

16    next week.

17         It's also not fair to say that discovery has been a

18    one-way street.  We produced more documents so far than

19    Mr. Adelson has.  I think we have about 4,000 pages --

20         THE COURT:  Sorry to interrupt.  So you're saying it's

21    not the case that you are holding up on the condition that I

22    grant the fee shift.

23         MR. WILSON:  That's correct, your Honor.  We recognize

24    that these documents need to be reviewed one way or the other,

25    so we moved forward to commence that production.  And

JCCTNATC

1    notwithstanding -- without prejudice, of course, we are asking

2    that the Court rule no our request to shift of the costs, but

3    we recognize that we need to move forward with discovery, and

4    so we have done that.  And we're actively reviewing those

5    documents, and as I said before, we have already in this case

6    produced more documents than Mr. Adelson has.

7              MR. EMERY:  Can I add one quick thing to that?

8              THE COURT:  Yes.

9              MR. EMERY:  I think there are -- first of all, to

10   answer your question, we did have a failed mediation which

11   everybody attended and I think in good faith tried, just so

12   you're aware of that.  That was a couple -- two and a half

13   months ago, I think, approximately.

14             The second thing relating to your questions about

15   discovery, one of the issues before you relates to the

16   discovery, obviously the addition of David Harris, either he

17   files his own case or is added here, and that is going to

18   affect discovery as well.  So there's been a little uncertainty

19   about the scope of discovery because of the Harris issue, which

20   remains up in the air.

21             THE COURT:  Okay.

22             MR. WILSON:  And the last thing, just for

23   completeness, we have worked with Mr. Adelson's attorneys.  We

24   have earmarked two weeks in January for the six depositions

25   that have been noticed, with the expectation that they could be

JCCTNATC

1    concluded at that time.  The additional document review that

2    we're undertaking right now and the potential to add Mr. Harris

3    may affect those dates, but we certainly have held those dates

4    with the intention of going through with them if we're able to

5    do so.

6            THE COURT:  So you think you're on schedule to produce

7    all the documents -- putting aside the Mr. Harris issue, you

8    think you're in a position to produce all the documents before

9    the depositions are scheduled?

10           MR. WILSON:  We're moving as fast as we can.  The

11   current number -- the short answer is I hope so.  But to be

12   more specific, we have given the vendor until December 20 to

13   conclude the threshold relevance review, but then it shifts to

14   our firm to review 50,000 documents.  It's a rolling basis, but

15   it's still a massive undertaking for our firm, so it's pushing

16   us into trying to review the documents over the holiday period

17   when staffing is more of an issue, and then we lined up the

18   deposition dates in early January.

19           So we're mindful that we have a deadline and are

20   working towards it, but depending on how things work out today,

21   it would certainly be a more humane schedule for the attorneys

22   on the team if we could have a little more room than January 31

23   to adjust these depositions, but we're taking the deadline

24   seriously and that's why we moved forward with retaining the

25   vendor and doing the review.

JCCTNATC

| 1 | THE COURT:  Okay.  So it's not a condition on
| 2 | production, as you suggest.
| 3 | MR. ARMSTRONG:  That's news to me, your Honor.  And
| 4 | also encouraging to hear that they continue to review.  That's
| 5 | news to us as well.
| 6 | THE COURT:  So let's go to the first issue, which is
| 7 | the request for leave to amend to add Mr. Harris.
| 8 | Mr. Armstrong, do you agree that you could file a separate
| 9 | lawsuit in any event?
| 10 | MR. ARMSTRONG:  I do, your Honor.
| 11 | THE COURT:  There's not a statute limitations issue?
| 12 | MR. ARMSTRONG:  I don't believe so, your Honor.
| 13 | THE COURT:  So given that, if I granted an extension
| 14 | of discovery by a couple of months, would you oppose the
| 15 | addition of Mr. Harris?
| 16 | MR. ARMSTRONG:  We would not, your Honor.
| 17 | THE COURT:  Okay.
| 18 | MR. ARMSTRONG:  It's simply that concern.
| 19 | THE COURT:  Okay.  So given that, I don't have a
| 20 | problem with the request to add Mr. Harris, coupled with an
| 21 | extension of say two months for fact discovery.
| 22 | Does that make sense to everybody?
| 23 | MR. EMERY:  It does to me.
| 24 | MR. ARMSTRONG:  Only because we don't have a good
| 25 | sense as to with we would get the documents, it sounds fine

1   now, and if we get them in early January, that should be fine.

2   But if it slips, then we may need to revisit the issue.

3       THE COURT:  Okay.  And it may be that you put you off

4   the depositions to February or whatever.

5       MR. WILSON:  Yes, your Honor.  We're in agreement.

6   We're going to be making a rolling production.  We would not

7   oppose some extension, reasonable extension if we're unable to

8   meet the deadlines that we're setting for ourselves internally

9   with Mr. Adelson's counsel.  We have already gathered together

10  the electronic discovery from Mr. Harris in anticipation of

11  adding him to the case, so we will be ready to apply search

12  terms, but we do need to meet and confer with Mr. Adelson

13  because I imagine there will be some additional search terms

14  that specifically relate to Mr. Harris.  So in the event that

15  that process takes us to a point where we need a little more

16  time, then I'm sure we could work something out and submit a

17  joint letter on that subject.

18      MR. ARMSTRONG:  That's fine, Judge.

19      THE COURT:  Good enough.  So the request to add

20  Mr. Harris as a plaintiff is granted.  Fact discovery is

21  extended from the end of January to the end of March for now.

22  That will be reflected in a minute entry or an order.  So you

23  will be able to file an amended complaint that adds him, I

24  assume.

25      MR. WILSON:  Yes, your Honor.

JCCTNATC

1          THE COURT:  In the next what, week or two?

2          MR. WILSON:  Yes, your Honor, two weeks certainly,

3   before December 20.

4          THE COURT:  Okay, amended complaint will be filed

5   within two weeks of today.  Actually between now and the 27th.

6   By the 27th there will be an amended complaint adding

7   Mr. Harris.

8          So let's go to the other issues.  The next issue, I

9   think, is the request for an award of interim costs and fees.

10  Plaintiffs request an award at this point of $429,000 in costs

11  in fees, and then periodic, I guess, awards thereafter.

12         And I guess here's my question:  In my opinion

13  granting partial summary judgment, of course I concluded that

14  the preconditions under the Nevada statute for compensatory

15  damages and attorney's fees and costs were met.  Of course, I

16  didn't determine that there were compensatory damages.  There's

17  an additional requirement that plaintiff prove injury before

18  there's any compensatory damages.  I don't know if there's any

19  case law on attorney's fees under the Nevada statute, I assume

20  it's like Section 1983 or many other attorney fee-shifting

21  statutes which require a bunch of factors to be considered,

22  including degree of success.  So my main question about the

23  request is putting aside what I think is fairly unusual,

24  awarding interim fees -- you cite cases, but I don't think it

25  happens much -- why would I do it when I don't know that

JCCTNATC

1      there's any compensatory damages?

2              MR. EMERY:  If I may, your Honor, you have been very

3      experienced in this statute already.  You actually wrote an

4      attorney's fees decision in this case about a year and a half

5      ago that looks at the Nevada law on fees.  But more

6      importantly, this statute itself doesn't seem to make

7      contingent fees on compensatory damages.

8              Now I don't think there's much dispute here, there

9      can't be any dispute that we would -- although Jones Day is

10     disputing it -- that we're going to obtain some amount of

11     compensatory damages which weren't attorney's fees.  There's a

12     great deal of evidence.  You will see the complaint in Harris,

13     in Harris' case, this is also true to some degree of Mark

14     Stanley, the organization lost contributions substantially.

15             THE COURT:  They'll argue causation.

16             MR. EMERY:  I understand they will argue causation,

17     but there's a whole series of various categories, silos of

18     damages here which are attributable to these events.  Timing is

19     very strong to indicate it, as well as a lot of direct

20     testimony as to the consequences.  In Harris' case, he

21     literally, because of this lawsuit -- and he will testify to

22     this effect -- quit the organization, had to go into therapy,

23     and changed his entire life, literally.  And you will hear all

24     of that.

25             THE COURT:  You said Stanley or Harris?

JCCTNATC

1          MR. EMERY:  Harris.

2          Now I do think as a first blush matter, the way you

3    ruled, and the way -- and I haven't seen any contrary authority

4    to the way you ruled, the compensatory damages is not a

5    prerequisite to attorney's fees.  The prerequisite to

6    attorney's fees is the dismissal of the original SLAPP suit.

7    The anti-SLAPP policy is very clear.

8          THE COURT:  But there's two buckets of fees.  There's

9    the first fees from the first case --

10         MR. EMERY:  I understand that.

11         THE COURT:  -- where I think it's basically automatic

12   from what I found were reasonable fees; happened to be for the

13   defendant in the defamation case.

14         Now we're looking at a separate case as to which the

15   Nevada statute says the person against whom the action is

16   brought may bring a second action to recover compensatory and

17   punitive damages and attorney's fees and costs of bringing the

18   separate action.

19         MR. EMERY:  That's right.  And it does not say, as I

20   understand it, that compensatory damages have to be awarded.

21   Now I agree with you that that is unlike any other attorney's

22   fees provision that I'm aware of, but that's what it says.

23         THE COURT:  Fair enough.  But I do think that it's

24   probably reasonable to read implicit in the statute a good

25   faith basis for thinking there are compensatory damages, if

JCCTNATC

 1    nothing else.

 2            MR. EMERY:  I think that's true, and I think your

 3    opinion in September and your grant of summary judgment on

 4    liability of compensatory damages is enough to satisfy that

 5    aspect and that policy under the statute.  The concept that

 6    we're not going to prove a thousand dollars, $10,000, $20,000

 7    in compensatory damages in this case is -- I mean I think there

 8    will be many millions that a jury would award here.  But the

 9    fact that you found liability I think satisfies the statute.

10    That's the argument we're making, that it satisfies the

11    statute.  And the notion is completely counterintuitive that we

12    will not prove any compensatory damages.

13            Let me say one more thing, and that is this case is

14    unlike any other and stronger than any of those that we have

15    cited because of the summary judgment grant under the statute

16    for compensatory fees and damages.

17            Maybe you feel in retrospect that you went too far,

18    but I don't think you did, and I think that it's now the law of

19    the case when these expenses started piling up and four

20    lawyers, sometimes five lawyers in our firm are working very

21    hard on this case, as well as a lot of staff, and we are at

22    $581,000 at this point right now, as compared to when we wrote

23    the letter, and it's an enormous burden.  And we are

24    financing -- the clients and we are financing --

25            THE COURT:  I assume this is on a contingency.

JCCTNATC

1              MR. EMERY:  Yes, I'm not going to deny that, of course

2         it's on a contingency.  We're a 25-lawyer firm, we take

3         contingency cases.  We did this one with good reason.  And we

4         assume we're not going to get any bonuses here, we're going to

5         get our fees, ultimately.  Perhaps maybe we'll have a bonus, we

6         might have a bonus, it's not clear.  But the fact is that we're

7         financing Jones Day's unlimited resources to do interlocutory

8         appeals, reconsideration motions, to push hard on discovery, to

9         do a lot in this case that over the last year and a half has

10        been, to say the least, innovative.

11             THE COURT:  Well, you choose to take the case though.

12             MR. EMERY:  Absolutely.  We're not going to do

13        anything other than pursue this case vigorously and represent

14        our clients no matter what your ruling is.

15             THE COURT:  Let me ask under the Nevada statute let's

16        say someone brings a separate action for compensatory and

17        punitive damages in a situation where there was literally no

18        compensatory damages, I probably still would have granted

19        partial summary judgment on liability for compensatory damages

20        even though no injury had been shown because the precondition

21        under the statute has been met.  But then they incur $5 million

22        in attorney's fees, would that be reasonable to award that if

23        the lawyer knew there's actually no compensatory damages?

24             MR. EMERY:  Your Honor, there's no question that this

25        matter, this issue of interim fees in Nevada and everywhere is

JCCTNATC

1    within your discretion.  It's something that you can make the

2    reasonable judgment about.  Obviously, if a case had no

3    compensatory damages and it was perfectly obvious and somebody

4    was milking that because they had gotten a ruling on attorney's

5    fees like the one you gave us, that would be within your

6    discretion to deny fees in the end, probably, and as an interim

7    matter.

8         Here it's also within your discretion, I believe, and

9    there's no question in my mind that this is something that

10   nobody can second guess.  He won, as a practical matter, that

11   in this case you know the history of this case, you know how

12   it's being litigated, you know that we are spending money on it

13   that is interest -- that is essentially interest-free

14   investment in the case, which is certainly something that we

15   took on, and I'm not suggesting it's not something we're taking

16   responsibility for, but at the same time, as a matter of

17   equity, when you have someone who has unlimited resources on

18   the other side and is using them extensively in the manner in

19   which he is litigating this case, as a matter of discretion, I

20   believe you can exercise that discretion to equalize the

21   situation between the parties.

22        THE COURT:  Well, Mr. Armstrong, I will give you a

23   chance to respond, but I want to continue on this for a minute,

24   because the cases under Section 1983 and the fee shifting under

25   1988 are based on the statutory language of prevailing party,

JCCTNATC

| | |
|---|---|
| 1 | and not judgment like the case that defendants cite under the |
| 2 | FLSA.  Now the case law -- first of all, I have actually never |
| 3 | had a request for interim fee shifting.  It's not common. |
| 4 | MR. EMERY:  I agree.  I don't think it is that common. |
| 5 | It happens. |
| 6 | THE COURT:  It happens.  I don't know that you have |
| 7 | given any particular reason for it other than the sort of |
| 8 | disparity in the kind of wealth of the parties. |
| 9 | MR. EMERY:  The financing of the litigation that they |
| 10 | are expending in a scorched earth manner, in my opinion. |
| 11 | THE COURT:  Okay. |
| 12 | MR. EMERY:  The interlocutory appeal is, in my view, |
| 13 | completely frivolous.  *Ernst*, in the Second Circuit, absolutely |
| 14 | makes it clear in a SLAPP suit, the same situation in Vermont, |
| 15 | there is no interlocutory appeal.  Whenever you reach the |
| 16 | merits of the underlying case, there can never be an |
| 17 | interlocutory appeal, and they can't escape that, no matter how |
| 18 | hard they try.  We obviously spent a lot of time opposing the |
| 19 | interlocutory appeal and making our motion to dismiss in the |
| 20 | circuit.  It's a perfect example of the manner in which this |
| 21 | case is being litigated. |
| 22 | THE COURT:  This is a contingency fee case.  You took |
| 23 | that risk. |
| 24 | MR. EMERY:  With someone who has unlimited resources |
| 25 | on the other side. |

JCCTNATC

1          THE COURT:  But Section 1988, Judge Caproni points

2     out:  As to Section 1988, the Supreme Court has held Congress

3     clearly contemplated that interim fee awards would be available

4     where a party has prevailed on an important matter in the

5     course of the litigation.  Under the Nevada law there's nothing

6     like that.  In fact, the Nevada law arguably textually suggests

7     that it should be the end of the case, because it says: may

8     bring a separate action to recover attorney's fees and costs of

9     bringing the separate action.  If anything, that seems to

10     suggest something other than the interim prevailing party

11     situation.  And in any event, you haven't prevailed on

12     anything.  There's not going to be an injunction here.

13          MR. EMERY:  Your Honor, I suggest the summary judgment

14     grant is prevailing.  It certainly creates a very substantial

15     change in the position between the parties.  And that's the

16     standard that I understand is a basis for a discretionary

17     interim fee award.

18          Now obviously it's most likely the case that in most

19     cases fees aren't awarded until after all appeals are

20     exhausted.  But this case seems to me to cry out for a

21     different treatment as a matter of discretion, and I don't

22     think there's anything about the Nevada statute which in any

23     way precludes you from exercising your discretion in this

24     regard.

25          In the 1988 cases there no cases where an entitlement

JCCTNATC

1    to fees has been ruled on already, as there is here, and it

2    seems to me that this case is stronger than any of the 1988

3    cases that are cited.

4            THE COURT:  Mr. Armstrong, you have been patiently

5    waiting.

6            MR. ARMSTRONG:  Thank you, your Honor.  I think your

7    Honor put the finger on the real Achilles heel here.  The

8    question you initially asked was on the basis of interim fees

9    and what the statute says about that, and we have had a

10   discussion about overall damages.  But the question that we're

11   here today on that is tee'd up before you is:  What is the

12   authority that you might have to award such interim fees, and I

13   suggest there is nothing.  The statute is silent on it.  You

14   already said that.

15           As you recognized in Adelson I, under Nevada law

16   what's important in figuring out the quantum of attorney's fees

17   is the result.  As you put it, "the result, whether the

18   attorney was successful, and what benefits were derived."  And

19   of course in that case you waited until the appeals were

20   exhausted before awarding the fees.

21           Here there is no prevailing party.  The Nevada case

22   says in circumstance like this the plaintiff here can be

23   considered a prevailing party, which is a term of art.  It's in

24   the civil rights arena.  And the case that they rely on, one of

25   their two 1988 cases, provides as follows, and I will provide

JCCTNATC

1    the cite for you later if that's okay, your Honor.  "Because

2    the statute was enacted to 'ensure effective access to a

3    judicial process to persons with civil rights grievances,' a

4    prevailing plaintiff 'should ordinarily recover attorney's fees

5    unless special circumstances would render such an award

6    unjust.'"

7            In those civil rights cases, in both cases, judgment

8    was granted either, and/or, finding the statutes or the

9    practice unconstitutional and issuing an injunction.

10           THE COURT:  Isn't that essentially what I have done,

11   though, by ruling in the underlying, in Adelson I, that the

12   anti-SLAPP statute applies, which is essentially a civil rights

13   statute, it's a First Amendment civil rights statute, isn't it?

14           MR. ARMSTRONG:  But it's not an action under this

15   specific statutory scheme, and there is no support for that

16   notion.  And it shouldn't be.  I mean these are not

17   similarly-situated plaintiffs, it's civil rights plaintiffs.

18           Mr. Emery's firm, as stretched as it may be, according

19   to him, he took on this case.  The NJDC was awarded $2 million,

20   about, by your Honor, and then decided to go forward and see

21   what they could get.  They understood who they were litigating

22   against.  And what they describe as predatory and scorched

23   earth is just Mr. Adelson doing what we can do as a defendant

24   under due process.

25           So this whole notion that we're pushing up the costs,

JCCTNATC

1    that we're extending this litigation, is not true.  But

2    remember the result here, there really is no result, your

3    Honor, because as you pointed out, we don't know what the

4    compensatory amount of damages are going to be.  Mr. Emery says

5    it's a very strong case, they will be able to show it.  I'm not

6    going to prejudge, but I will say this:  In the documents that

7    they have produced thus far, there is no documentary support in

8    contemporaneous records that indicates that any damage was

9    caused by Mr. Adelson; indeed, it tells a totally different

10   story, which makes it a little irritating.

11            THE COURT:  What about the emotional distress and the

12   time of having to deal with it and having to find a lawyer,

13   that's some compensatory damage.

14            MR. ARMSTRONG:  That's a moving target, too.

15   Mr. Stanley started with a very broad-based emotional distress

16   claim, and now he's pulled that back to garden variety

17   emotional distress with basically no discovery.  So this has

18   been a moving target from the beginning.  And the story that

19   the documents tell is one of a completely inept organization

20   that can't fund raise, infights, lawsuits against each other.

21   The only mention of Mr. Adelson is in the context of being sort

22   of gleeful that they're fighting with their arch nemesis.

23   That's what the documents thus far show.

24            In addition, we may obviously ultimately prevail on

25   appeal.  And if so, that would render all of this moot, and

JCCTNATC

```
1   then there would have to be an undoing and unraveling.  What's
2   more, in cases such as this interim fee applications, it's not
3   simply we really don't want to spend more money, could you give
4   us 500,000, there's a process by which I assume, if you were
5   inclined to do any of this, you would have a magistrate judge,
6   you would have plaintiffs submit bills, we get the right to see
7   if the fees are reasonable, and this would go -- then there
8   would be a report and recommendation to your Honor.  This would
9   go and on and on, all of which may be rendered moot, and the
10  ultimate result of the case could be zero, as unlikely as
11  Mr. Emery thinks, or there is a reversal on appeal and an
12  ultimately victory of Mr. Adelson.  This unprecedented, your
13  Honor, there is absolutely no basis for interim attorney's fees
14  here.
15          THE COURT:  Okay.  Anything you guys want to add?
16          MR. EMERY:  One quick point.  I think our contention
17  is the statutory scheme here you ruled on is much more
18  solicitous of granting fees in the general sense than 1988.
19  And that that's why a ruling base on compensatory damages
20  triggers that.
21          More pointedly, the precondition, that is, dismissal
22  of the original SLAPP suit, is the only issue here.  There's no
23  prevailing party language; not that we wouldn't have to be
24  prevailing parties, but we are prevailing parties already, in
25  my view, with respect to the liability issue and the attorney's
```

JCCTNATC

| | |
|---|---|
| 1 | fees issue, which you ruled on.  And that's really the basis on |
| 2 | which we're asking you to exercise your discretion. |
| 3 | THE COURT:  You're basically asking for me to shift |
| 4 | all the fees you have you incurred so far.  At least I would |
| 5 | have to go through some reasonable fee analysis and give them a |
| 6 | chance to object. |
| 7 | MR. EMERY:  Right.  We could submit you the bills |
| 8 | tomorrow.  They're very detailed.  They're very carefully put |
| 9 | together.  It's not like your first case where you had simply |
| 10 | affidavits of work.  There are contemporaneous bills that are |
| 11 | by every lawyer that's worked on this case, every paralegal |
| 12 | that worked on this case, and it would be a pure lodestar |
| 13 | analysis at this point. |
| 14 | THE COURT:  Did you want to add something? |
| 15 | MR. WILSON:  Your Honor, there is one other discrete |
| 16 | issue which related, and that is costs, which I think could be |
| 17 | analyzed under a slightly different framework in that there |
| 18 | are -- there is precedent with electronic discovery to shift |
| 19 | burden in circumstances where the party who is seeking it is |
| 20 | seeking a substantial -- well, their requests require the other |
| 21 | party to incur substantial burden.  So I think as your Honor is |
| 22 | considering whether to shift fees, there should also be |
| 23 | consideration whether to shift costs. |
| 24 | In this case we have been working well with |
| 25 | Mr. Adelson's counsel in trying to narrow the scope of these |

JCCTNATC

requests, and I think that's a process which worked well, but
it still has resulted in quite a massive document review which
has concrete out-of-pocket costs associated with it.  And right
now the run rate of the search terms we have agreed upon is
around 12 percent to be responsive.  So we have contracted to
be able to undertake this with a vendor to do it quickly, but
that is a substantial cost which is the result of Mr. Adelson's
requests that he sought.  So that was part of the request is to
shift that burden to the party who is seeking that.

THE COURT:  Understood.  And there may be discrete
issues that I will let you respond to that on that, but what is
the amount, 50,000 or something?

MR. WILSON:  The vendor costs specifically is
approximately $55,000, and that will change depending on --
obviously Mr. Harris' data set would affect that.

THE COURT:  Did you want to say anything about that,
Mr. Armstrong?

MR. ARMSTRONG:  I did, your Honor.  The presumption
here -- and the plaintiffs allow for this -- is each responding
party pays its own share.  Our costs for the same first level
review of the documents that were netted by their search terms
was essentially the same, and we obviously didn't go to them.

At bottom, with all of this request for fee shifting
and cost shifting, what I'm hearing is it's a firm who took on
a contingent lawsuit and now wants the defendant, who has a lot

JCCTNATC

1  of money, to finance that lawsuit.  I've never heard anything

2  like this.  There's no support in any case I have ever heard of

3  that would support something like this.  They have to convince

4  you, Judge, on costs, now that we're talking about costs, to

5  not follow the presumption.  They have given you no legal basis

6  to do that other than, quote:  Help me out, your Honor.

7          THE COURT:  I understand all those points.  The one

8  tweak to how you describe it that I would add is they have won

9  partial summary judgment on entitlement to compensatory damages

10  and attorney's fees for this separate action.  And I spun out

11  the scenario where there's no injury to plaintiffs, and in that

12  scenario there's an argument they should actually get nothing,

13  not even the costs.  But as long as the plaintiff's lawyers had

14  a reasonable basis for thinking there was some compensatory

15  damages, it's surely reasonable for them -- and we know now

16  they're going to recover the costs of vendors in searching

17  through emails, right?

18          MR. ARMSTRONG:  If I may, let me push back on that,

19  Judge.  We don't know what the record ultimately is going to

20  show.  I have to make that explicit.  But if they reviewed the

21  documents that they produced to me, it would be unreasonable to

22  think that they will get compensatory damages here.  Because

23  other than the self-serving testimony of Mr. Stanley and now

24  Mr. Harris, the documents do not support that narrative.

25          Mr. Adelson's lawsuit did not cause the demise of this

JCCTNATC

1    institution.  Just didn't happen.  Now that may change, but if

2    all they saw was the universe that I saw, it would be

3    completely unreasonable.  If I went back to my partners and

4    said I have this contingency fee case but here are the relevant

5    documents, I would be laughed out of the room.  I don't think

6    that's reasonable.

7         THE COURT:  Okay.  I'm going to reserve on this now

8    because it's an interesting issue.

9         The only other question I was ask, I was going to

10   spend time looking at Nevada law specific to this statute on

11   this particular fee shifting issue.  I assume you all have

12   looked at that and there's nothing particularly helpful along

13   the lines of interim fees under this law.

14        MR. WILSON:  We have looked at it and we would have

15   given you those cases if we found them, but we have not.

16        MR. EMERY:  Either way.

17        THE COURT:  And do you agree with me?

18        MR. ARMSTRONG:  I do agree, but it does come back to

19   case that you cited in Adelson I, which is the result.  I don't

20   know how a judge would be able to in any way value the level of

21   the win that they have already achieved without seeing the end

22   result.  So even if there were compensatory damages, what if

23   they wound up being 500,000 and they spend 7 million together,

24   that is in hindsight.  You need to wait to the end to provide

25   anything to stay in compliance with Nevada law.

JCCTNATC

1        THE COURT:  I take the point, although I think even

2    you acknowledge that the individual plaintiff here is seeking

3    garden variety emotional distress, and surely there's a good

4    faith basis for the plaintiff to think is some compensatory

5    damages, and there's kind of a threshold amount of fees

6    generated, maybe a couple of hundred thousand dollars or a

7    hundred thousand dollars or something, that I would think goes

8    with any reasonable undertaking of the case in that situation,

9    even if it's more than the compensatory damages that a jury

10   will ultimately find.

11       MR. ARMSTRONG:  Even if that's so, remember, we agreed

12   on the legal standard, which the presumption is otherwise.  And

13   so I'm still at a loss to understand what the basis is to

14   reverse that presumption.

15       THE COURT:  You don't think that I have discretion.

16       MR. ARMSTRONG:  I don't know.  If you don't mind, I

17   would like to think about that a bit more.  I don't know the

18   answer to that question.

19       THE COURT:  I'm going to reserve on that.  It's an

20   interesting question and this case is full of them.  I'm going

21   to think about that a little more.  If there's any more case

22   law that you find, obviously you should let me know.

23       By the way, before we get to the issue of Miriam

24   Adelson, I wanted to ask what you all have in mind in terms of

25   where this case goes under Nevada law at the end of the day.

JCCTNATC

1  Is it a jury trial or is it bench trial, or is there a law on
2  that, do you know?
3           MR. WILSON:  Your Honor, I don't think there is law on
4  it, but I think the presumption is that it would be a jury
5  trial, but that's something that we haven't discussed with
6  Mr. Adelson's attorneys yet.
7           THE COURT:  Do you guys have views on that yet?
8           MR. ARMSTRONG:  We don't, your Honor.  We haven't
9  thought about it.
10          THE COURT:  Okay.
11          MR. ARMSTRONG:  But we'll confer in good faith, and if
12 the law is clear, then we certainly won't dispute it; and if
13 it's not, it will be another interesting question for your
14 Honor.
15          THE COURT:  Okay.  And then I think the last issue,
16 unless there are others that you want to raise, is the question
17 of service of a deposition notice and subpoena on Miriam
18 Adelson.  And I read your letters on this.
19          Frankly, I don't know that I have enough before me to
20 decide it, and it makes me somewhat tempted to direct defense
21 counsel to accept service on her behalf, given the
22 representation in the documents about her having an
23 attorney-client relationship with defense counsel, and then
24 maybe filing a motion to quash the subpoena or whatever you
25 would file if it were served.

JCCTNATC

1          And the reason for that is I just don't know, there's

2     one email that plaintiffs cite, I don't know that that moves

3     the ball very much.  There's the issue of spousal privilege

4     that would limit what she could talk about, perhaps

5     attorney-client privilege will limit what she could talk about.

6     I'm not sure what need there is for it.  Is it proportionate to

7     the needs of the case, is kind of the question that I have.  I

8     will hear from both you; otherwise, I might need more briefing

9     on this.

10          MR. ARMSTRONG:  So we have two issues.  The one that

11     is tee'd up before you today by the letter is simply service.

12     And if they obtain that from you, then the next fight will be

13     over the actual deposition.

14          On the service, again, no authority to support the

15     proposition that Mr. Adelson is to be deemed the agent for his

16     wife to accept service.  True there was an affidavit submitted

17     with respect to Adelson I and Dr. Adelson's dealings with

18     Mr. Adelson's counsel to explain why we believe those

19     communications are privileged and why we put them in our

20     privilege log.  That's a very specific agency, and it's an

21     agency of Dr. Adelson.  There is no evidence in the record that

22     Dr. Adelson ever gave Mrs. Adelson the right to accept service

23     of process.  But they are married and stood at the alter and

24     said "I do," but that doesn't mean, "I do accept service for

25     you."  I don't think it means that in Nevada.

JCCTNATC

1          THE COURT:  I hope not.

2          MR. ARMSTRONG:  I hope not, too.  Doesn't mean it

3    here.  There's no law to support that, your Honor.

4          THE COURT:  But didn't it follow from that

5    representation that your firm represents her, or not?

6          MR. ARMSTRONG:  I don't believe so.  I want to check

7    that.  I don't want to misrepresent anything to the Court, but

8    I don't -- I think it was only the attorneys from Adelson I,

9    but if you guys know differently, please --

10          THE COURT:  I guess you guys weren't in Adelson I.

11          MR. EMERY:  We were not.

12          THE COURT:  Do you want to address that issue?

13          MR. EMERY:  Let me just say that we believe she has

14    extraordinarily probative information about the events that

15    occurred between late July when the reports of the Macau

16    activities were first reported by all the big press services,

17    and then on August 5th the NJDC put up its petition referring

18    to those under the fair report privilege, which we all learned

19    about here, and then after it was taken down on July 11 --

20    sorry, late June, starting in late June when the first reports

21    came out, early July is when the petition went up and then came

22    down, and then there were demands for an apology, which is

23    reflected to some degree in that email that we cited to you,

24    and then in early August when the demands for an apology and

25    Mr. Adelson said in his deposition is he didn't care about the

JCCTNATC

money, he sued them for $60 million, but he just wanted his
pound of flesh and an apology and the like, and he sued them
then in early August.

She was a part of this whole decision-making process
all through that time.  She clearly has a lot to say about
punitive damages, in our view.  Mr. Adelson does not use email,
she does.  I think her emails will be very important in this
case beyond the one that we have.  We may have others that I
haven't reviewed yet but that are going to be produced, but the
fact is we do have this one.  And her role in Mr. Adelson's
life in making decisions about protecting their businesses, as
they see it, and protecting his reputation, as she sees it, is
very, very prominent.

Then we have, an addition, their statement that she
was acting as his agent and that therefore she should not be
viewed in the normal sense.  The context of that was the
affidavit that was filed by Mr. Adelson in saying that she was
his agent in this matter.

And so I just think that she's a central witness.  I
don't think there's any way around it.  She's central to the
facts of what occurred in the summer of 2012.

THE COURT:  But what about the legal question about "I
do" doesn't mean "I do consent to a subpoena."

MR. WILSON:  Your Honor, we have a 15-page privilege
log which is populated largely by communications between

JCCTNATC

1    Dr. Adelson and various attorneys, and with that privilege log

2    is the declaration that she acted as the agent of him.

3            So our argument is basically we have a witness in the

4    case who is at the center of communications relevant to the

5    case, we think that there are a number of communications with

6    people outside of the privilege.  We have about two dozen

7    emails that talk about the repercussions of the case, people

8    like Alan Dershowitz and Rabbi Shalomi, other sort of prominent

9    figures in the community that write emails of support to

10   Dr. Adelson, and through her, Mr. Adelson.  And the premise is

11   very straightforward.  This is someone who is right at the

12   center of decision making who may have had communications with

13   others about the decision to bring the case or not bring the

14   case.

15           We have been very judicious in our discovery in the

16   case.  The deposition of Mr. Adelson, perhaps one of the most

17   important people, did not run the full seven hours.  We noticed

18   the deposition for Dr. Adelson in Las Vegas with the intent of

19   going out.  I don't think this is more than a half day

20   deposition focused on the documents, we already have been

21   produced about 24 emails, and any other oral communications.

22           The legal issue that begins all of this is agency.  It

23   just struck us that having served her already in Nevada and

24   having not received any response from her back in the summer,

25   that now that we have a new declaration saying that we can't

1    get any communications from her with lawyers because she's

2    Mr. Adelson's agent, it struck us there seemed to be a

3    disconnect between her asserting she is an agent of

4    Mr. Adelson, yet at the same time Mr. Adelson's attorneys can't

5    accept service on her behalf.  So we thought those two things

6    were related.

7              I suppose the alternative is we go to Nevada and we

8    move to compel based on service from May, and it's further

9    expense in the case, which we certainly can.

10             THE COURT:  So the declaration she was an agent of

11   Mr. Adelson was admitted.

12             MR. WILSON:  In this case to support a privilege,

13   assertion of privilege.  The declaration was provided here to

14   support the privilege log, and the underlying communications

15   for which she was an agent are on Adelson I.

16             THE COURT:  So she has not produced documents in this

17   case.

18             MR. WILSON:  Well, we have received documents in this

19   case, but they were produced by counsel for Mr. Adelson.  So

20   how is it Mr. Adelson has possession of her emails is a

21   question for Mr. Adelson's attorneys, but I think it is because

22   Mr. Adelson communications to others through her and her email

23   account.

24             THE COURT:  So are there emails that are responsive to

25   the requests that are to and from Dr. Miriam Adelson that have

JCCTNATC

1    not been produced?

2            MR. ARMSTRONG:  One second, Judge.

3            (Pause)

4            MR. ARMSTRONG:  Your Honor, as we sit here now, we

5    don't know if there's any emails between Dr. Adelson and

6    Mr. Adelson that have been produced.  We know that we checked

7    with servers of the SAN's and Mr. Adelson, and to the extent

8    there were any responsive documents that were not privileged,

9    we produced them, and we know we did produce such documents.

10           THE COURT:  But did you search emails to and from

11   Miriam Adelson?

12           MR. ARMSTRONG:  Yes, your Honor, on their SAN's

13   account.

14           THE COURT:  So you already have the documents.

15           MR. WILSON:  That's right, your Honor, we have

16   non-privileged documents from her.  We want to depose her on

17   those documents and other oral communications that relate to

18   the subject matter of those documents, and we need to serve

19   her.  We served her in Nevada but she didn't respond.  She is

20   the wife the defendant in this case.  Mr. Adelson has, since

21   our service, supplied us with a declaration saying that he will

22   not produce additional documents from her email account on the

23   grounds she was acting as an agent for him.

24           THE COURT:  Why would that be a basis to not produce

25   documents?

JCCTNATC

1          MR. WILSON:  Because the argument is that she is a

2     conduit for the privilege, that if she speaks to a lawyer,

3     she's speaking on behalf of Mr. Adelson.

4          THE COURT:  Communications to and from lawyers.

5          MR. WILSON:  Correct.

6          THE COURT:  But her communications to and from other

7     people, like Mr. Dershowitz, they have to.

8          MR. WILSON:  Those documents have been reviewed and

9     produced to us.  And so what we have is a witness for whom

10    Mr. Adelson seems to have the custody and control of some of

11    her documents, and for which Mr. Adelson is arguing that there

12    is an attorney-client privilege that flows through her because

13    she is an agent, and so he is benefiting from that agency

14    insofar as he is asserting privilege, but then he is trying to

15    also use it in some sense as a shield from receiving process of

16    the deposition subpoena.

17         MR. ARMSTRONG:  To go back to beginning; sort of

18    muddied, but talk about the merits of the deposition.  The

19    reason that they want to depose Dr. Adelson is to try to prove

20    punitive damages.  That requires not what is in Dr. Adelson's

21    head but what's in Mr. Adelson's head, his mens rea, his

22    impression or thought to bring the demise of the NJDC.

23         They have given you nothing, your Honor, other than

24    the affidavit we have been talking about, the agency affidavit

25    for purposes of attorney-client privilege, and an email that

JCCTNATC

they grossly mischaracterize as Dr. Adelson saying we are going
to bully the NJDC now.  I respectfully ask you to take a look
at that email.

THE COURT:  I did.

MR. ARMSTRONG:  It's not what it says, and I'm
surprised such good lawyers would do that.  But they have given
you nothing else.  The fact that they're married, courts in the
circuit have said to watch carefully, because the polite word
for what they're doing is seeking a fishing expedition, and
impolite word is let's get her to the deposition chair and then
maybe Mr. Adelson will finally write us a bit check.  That's
what is going on here.  There is no basis given to you for what
she might know that wouldn't be privilege because her husband
said it to her at night before going to bed or she was talking
to the attorneys in Adelson I.  If they want to attack the
privilege, that's one thing, but in terms of whether is this is
proportionate under these circumstances, I have heard nothing
relevant other than repetition that she's his wife.

THE COURT:  Do you want to respond?

MR. WILSON:  Your Honor, the email itself speaks for
itself.  What it is, and your Honor has read it, is it's a
discussion about the bullying dynamic going on with this
litigation.  They were alleged by -- NJDC was complaining that
they were being bullied by Mr. Adelson.  Dr. Adelson responded.
Whether her response is with a sense of irony or frustration or

JCCTNATC

1  whether she's delivering it straight is a question for her to

2  answer.  I think it could be subject to multiple

3  interpretations.

4      The reasons that we submitted it, your Honor, is just

5  to show that she's talking about these things in a

6  non-privileged way with other parties, and that's a reasonable

7  area for inquiry.  And this is not a fishing expedition.  She

8  is someone who was fielding conversations.  And we have another

9  dozen emails of this ilk where she's communicating with people

10 about the decision and repercussions of the lawsuit, which is

11 not going to be -- like I said before, I don't perceive this to

12 be a very long deposition, but it would narrowly tailored,

13 focused on the communications that she had concerning the

14 decision to bring and the repercussions from the lawsuit.

15      THE COURT:  I would probably be inclined to direct

16 service of the notice of deposition, given the agency

17 admission, for lack of a better word, but I am really not

18 persuaded that it's proportionate.  I don't think the

19 deposition of Mrs. Adelson, given the most probative material

20 would be either attorney-client or more likely spousal

21 privilege, it doesn't seem to move the needle.  I want to

22 confirm that you have the emails.  I was going to grant the

23 relief of ensuring that any emails that are not protected from

24 or to her are produced, and I want you to confirm that you have

25 done that, but other than that, I'm not going to order her

JCCTNATC

1    deposition.  I don't think it's proportionate.

2            MR. WILSON:  Your Honor, we are limited to emails, and

3    we would request that the email search would not be limited to

4    the SAN server but also any other email accounts that

5    Dr. Adelson used as agents for Mr. Adelson.

6            THE COURT:  I think that's fair.

7            MR. ARMSTRONG:  Okay, Judge.

8            THE COURT:  Anything else for now?

9            MR. ARMSTRONG:  I think that's it.

10            THE COURT:  Thanks everybody.

11            MR. ARMSTRONG:  Thank you.

12            THE COURT:  Have a good holiday.

13            (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25